David Del Toro v. Raymond Madden David Del Toro v. Madden David Del Toro v. Madden David Del Toro v. Madden Yes, there was a Maddox-Remmer violation here when the juror in the fifth day of deliberations brought in information from a news source that manslaughter carried only a seven-year sentence, so the defendant would only be serving two more years. This was obviously in the aftermath of some discussion about manslaughter, which we both know and can surmise from the record, and there's little doubt about that. Let me ask you this. What's your best authority for applying the presumption set forth in Remmer to the state trial court in which a juror is not approached by a third party, but offers her opinion about the appropriate punishment after being instructed not to consider punishment? So she's not approached by anyone here. She just doesn't obey what the court says. It's extrinsic evidence as defined and accepted by the en banc court in Jeffries v. Wood. Mr. Fisher, Jeffries was a pre-AEDPA case. Yes, it was, and to the extent that I hinted in a footnote that it was an AEDPA case, it was not, and that was a mistake to say it that way, but the court did say the result would be the same. Okay, but if we give you that the presumption applies, is it a presumption that can't be rebutted? The presumption surely can be rebutted, and the failure of the primary second issue here, the main issue, is the unreasonable application by the California Court of Appeal, actually, the lone lead opinion of retired Justice Woods that did not mention or apply the presumption, or the Maddox-Remmer rule, and that very much disregarded the risk of influencing the verdict that this evidence suggested, which tracks the original application of Remmer by the en banc court in Godoy v. Spearman, then was applied in, really, the leading case here, Judge Hall's opinion, 15 years ago in Caliendo. I just don't know, Mr. Fisher, what I struggle with here is from, we are looking through it through an AEDPA lens, but that being said, if you do trial work, which I'm assuming that you do, you're doing things wrong all the time, and it's not, having been a former trial judge, after you finish the trial and you tell them exactly what they should do, when you get a note or whatever and find out people are doing what they're exactly not supposed to do, of course you're not very happy, but I don't really see what the trial judge could have done differently here, in terms of questioning, determining who would be affected by it, who wouldn't be affected by it, and then you have a completely reconstituted, the person that said it's removed, and then the other person that said was bothered by it's removed, you have a reconstituted jury, and everyone else says, hey, we told her not to talk about it, we're not going to do that, we're going to follow the law, why isn't that okay? Why don't we presume that they followed the law? And the trial judge was in the position to decide whether these people were being honest or not. The trial judge could have decided, hey, I think this is too bad, I don't believe that you would be unaffected or whatever, but the trial judge did everything that I would have done if I was in those circumstances. I think you would have done something else, Judge Callahan, I think you would have asked the attorneys to present their position too, and allowed them to be heard, because then they would have made the record that does not appear in the decision of the California Court of Appeal in reviewing what the trial judge did, and it certainly doesn't appear anywhere in the excerpt of record of what the trial judge did. He did not question the jurors who perhaps were most significant about what juror number five, as we pointed out in the opening brief, pages 22 and 23, I believe it is, that juror number five explained that she and a couple of other jurors, and it may have been as many as four, were thinking about going a little further down. And that, of course, means on the verdict. Here they were faced with the wrong information, the judge never told the jurors what the actual sense was, and believe it or not, it's the same 3-6-11 triad that it was when Judge Callahan, when you were in the trial court and the Court of Appeal, and when Judge Pius was in the trial court. It's been there for years and years. All of that would have been considered, because the jurors were wrong. Juror number two's extrinsic evidence was wrong, and the jurors were... I hear you say that the trial judge should have told them what the real sentence was? In a case like this, he had to at least disabuse them of the possibility that they, having discussed this, and with at least four jurors possibly of the 12 involved, at least four was the reference somewhere in the record here, and I could give you the ER site, although I'm sure you know it, it was page 117, more than four, that were thinking of going about manslaughter and possibly going lower than the first or second degree murder that many of the jurors were talking about doing. It can't just... What the attorneys would have done, would have been to expose to the judge in deciding what to do with this, and one of them would have been to grant a mistrial or a new trial, is that the jurors were too badly infected with this idea that manslaughter would have been punishable by only two more years, and the juror would be out, which was wrong. Mr. Fisher, this is Judge Lynn. I want to make sure I'm understanding you. You're not saying that once this occurred, King's X, the judge had to declare a mistrial. What you're faulting is how the judge dealt with the circumstances? Yes, that is exactly right, because all the judge had to do was have the kind of hearing that involved participation of attorneys with input, and to make the arguments that appear nowhere in the lead justice's California Court of Appeal opinion, which is why there is an unreasonable application here, because none of this is reflected, and that is the standard of review. This court must apply. It's a tough one for petitioners, but that's what AEDPA is all about, and it's pretty clear to me that if this isn't as reversible, or at least error on the same ground as it was in Judge Hall's opinion, or in Clark v. Chappell last year in 2019, repeated by this court, then there surely has to be some consideration of what to do with this case besides just upholding it on the fiction that the judge's questions and the admonition to the jury may have disabused the jurors of thinking about what they thought about for days. Mr. Fisher, you know, when after Judge Ito excused those jurors number two, and was it number six? Six, yes. And then he put in the alternates, and then he instructed them, right, to go back and begin their deliberations anew? Right. And he told them, if I'm not mistaken, he told them they're not to consider punishment or the penalty. Yes. Right? Yes. So why doesn't, you know, ultimately you have to find prejudice, so how does that fit into this? Well, prejudice then is the last step, isn't it? It is the step of applying Brecht, and I for one am happy to urge the court to follow the Caliendo approach, and to find that wasn't good enough because the standard is so difficult. It is, after all, a beyond-a-reasonable-doubt standard. What is the language that we have in Baramoglu, for instance? Beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict. Well, beyond a reasonable doubt is not something that a judge's admonition is good enough to cure, but assuming that that makes it a close case, we still don't know some of the things that we would have known that maybe require an evidentiary hearing, which is the solution the per curiam decision in Clark last year followed. We're speculating. We don't know that, and we can't assume in every... There is no rule, your honors, that giving the admonition cures the whole lot. No, the presumption of prejudice being rebutted requires that a showing be made, and it isn't our burden. It was the prosecution's burden. They do not demonstrate that. They do not show that jurors like juror number five weren't... The risk of infecting the further deliberations on which juror number five stayed on the jury was dissipated. Let me ask you this. No, I want to be sure that I leave a little time to respond. I'll give you a minute or two to respond, but I just have one last question for you for my end, which is you keep complaining about what Judge Ito did. Well, I'm really talking about what Justice Wood did. I'm talking about... The record is the one that's created in the trial court. Yes, yes, yes. And I am very happy and comfortable in relying on the discussions on places like ER 112 to 113 about the decisions having changed because of what the jurors heard, or on 115 the discussions became hostile, or on 117 that involved more than four. Those kinds of issues were swept under the rug here by Judge Ito on the thesis that by excusing two and six, but not others like five, and saying don't consider punishment, that that ends it. Well, no case that I've ever found stands for that proposition, and I believe the rule really goes the other way. With cases as tough as Godoy and Hall and Judge Hall's decision, and even Clark, which had the problem but decided we need more information, the solution is not to affirm. Okay, let's hear from the State. Good morning, Your Honors. May it please the Court, Deputy Attorney General Herb Tette on behalf of the Warden. The District Court properly denied habeas relief because it was objectively reasonable for the California Court of Appeals to determine that there was no prejudice from the misconduct. The record shows that at one point during very lengthy deliberations, there was a short discussion about the penalty for manslaughter. There's no question it was improper and a constituted misconduct. The only issue was whether or not the California Court of Appeals reasonably determined it wasn't prejudicial. And there are numerous reasons why that was a reasonable determination. First, the discussion lasted no more than five minutes, and the jurors themselves put a stop to it. They referenced the jury instruction that they weren't supposed to consider a penalty. Apparently it came up on several days, Wednesday, before lunch, after lunch, on Friday, on Monday. Yes, and I'd like to clarify exactly what happened on those days. On the first day, Wednesday, before lunch, that's when this discussion took place, and the jurors said we're not supposed to talk about it and referred to the instruction. After lunch, juror number six came back and said she was troubled that they even talked about it. And the jurors basically, again, referenced the jury instruction and said we have to put it behind us. The following Friday, juror number six, who apparently was very troubled by this whole discussion, brought it up again and said I'm troubled that this happened. The other jurors, again, basically said, you know, we're not supposed to consider this. We need to put it behind us. And then juror number six brought it up again the following Monday, and then that's when it was brought to the attention of the trial court. But a reading of the responses from all the jurors shows that it was juror number six who was really troubled by the discussion. All the other jurors essentially said that it was just a comment, it was just short discussion, and they were able to put it behind themselves and move forward. And it appeared that they were surprised juror number six was having so much difficulty. And so eventually the trial court removed juror number six, who was the juror who was troubled, and juror number two, who brought up the issue in the first place, but had a lengthy questioning all the remaining jurors. And the trial court said on the record that it felt disturbed by this. Counsel, where were the lawyers at that time? Mr. Fisher seems to indicate they had no input. That's not true. The lawyers were present at the hearing. The trial court said that it would ask any questions that the lawyers had. He just didn't want the lawyers to directly question the jurors. And after each juror was questioned, the trial court turned to counsel and said, do you have any questions? And on several occasions the attorneys did, and defense counsel proffered several questions for the court to ask the jurors. So the concept that the attorneys were not involved in this questioning was completely wrong. They were allowed to present to the court any questions they had. And as far as their input, once all the questions were excused at the hearing, the attorneys were allowed to make their arguments about what they thought should be done. So there was a full hearing. And in a lot of ways, this case is very different from a situation where after a verdict comes in, there's some evidence of juror misconduct and then we're left to speculate about what happened. In this case, it was brought to the attention of the trial court. The trial court held a hearing, questioned each juror about it, allowed the attorneys to present any questions they had, and then made a ruling based on a complete gathering of information. And as Judge Pius pointed out, after the alternates were impaneled, the judge instructed them to start their deliberations anew, instructed them not to consider penalty, and then they went back and they deliberated for another two days. It wasn't a situation where they quickly came to a verdict. It appears that they followed the trial court's instructions, deliberated for two days, and then reached a verdict. Do you concede that Remmer and Maddox applies to the facts here? I do not. Remmer and Maddox were cases that involved third-party contact with jurors. And under the AEDPA standard, a state court is only bound by clearly established Supreme Court law. And Remmer and Maddox are not applicable across the board to all jury misconduct or even the introduction of extrinsic evidence. They concern third-party contact with jurors, which did not happen here. We don't even know where this juror got the information. It's quite possible she got it from a news story, but we don't know. Do you have any authority that suggests that the presumption set forth in Remmer does not apply to a situation where a juror is not approached by a third party but offers their own opinion about appropriate sentence after being instructed? Are you saying there's nothing? You're taking Remmer on its facts alone, and there's nothing that says it's extended? I'm not. Is there any authority out there that says that Remmer can apply to this situation? I think that all the cases that talk about Remmer say that it is a case that concerns only third-party contact. We have cases where we've denied habeas relief where we've assumed that Remmer applies. Isn't that right?  Aren't there Ninth Circuit cases where we've denied habeas relief where we've said that we've just assumed that Remmermatics applies to where a juror sort of intrinsically engages in some sort of misconduct, like here? Well, I think that that's the case, but I think perhaps that's because sometimes it's easier just to dispose of the prejudice issue. So I think that that is the case, but I do want to point out, and I think this is very important, is that regardless of the application of Maddox and Remmer, the California Court of Appeal did apply a presumption of prejudice, and I'd like to explain that. Under California law, all jury misconduct is considered prejudicial, and in this particular case, the Court of Appeal applied the standard that is applicable to the presumption of prejudice, that is, whether there is a substantial likelihood of juror bias. That test is based on a presumption of prejudice. So while the California Court of Appeal did not explicitly state it was applying a presumption of prejudice, it applied the law referring to People v. Nestler and set forth that law, and that law is based on a presumption of prejudice, and that's what was applied in this case. So there was no misapplication of Supreme Court law, even if Maddox and Remmer applied here. So in your view that there was no prejudice, even if you presume prejudice, and explain to me exactly how you get there? So the presumption of prejudice was rebutted for a number of reasons. First, in this case, we had a trial court which held a hearing and questioned each and every juror about what happened. After doing so, it took remedial action by dismissing the juror who brought up the issue of penalty and also dismissing the juror who said she was troubled by it. All the remaining jurors essentially said the discussion was brief, that it was just a comment in passing or something that wouldn't affect them, and the trial court specifically asked the jurors, are you able to set aside this discussion and reach a verdict without considering penalty? And the jurors who remained said yes, and the trial court felt assured that they could do so, which is essentially a credibility determination which has to be given some deference. Let me ask you this, counsel for petitioner seemed to, I don't know if he specifically said it or I'm taking it by implication, that the trial judge didn't seem to be aware of the fact that, no one made him aware of the fact that he could just grant a mistrial right there. Oh, he was certainly aware. In fact, petitioner's counsel moved for a mistrial, and the trial judge denied it. I think there's nothing to suggest in the record that the trial judge was unaware of its power to grant a mistrial if it felt that it was so prejudicial it was necessary. Mr. Teteff, is it Teteff? Teteff? Yes. How could, is it even really possible for a defendant in this kind of circumstances to ever show prejudice? That is, here, as you just pointed out, you know, the judge took remedial action, admonished the, drew two new alternates, admonished the jury to begin a deliberations anew. Does that just end it right there? I mean, why can't you look at the nature, why can't you look at the nature of the substance of the misconduct and say, you know, it's just so offensive that we can't, we just, you know, we can't go along with the idea that it didn't have some prejudicial impact, especially here when they were, you know, the jury deliberated for, what, a total of eight days. It was six days when they got to this point, and it was a debate over whether or not, it appeared to be a debate whether or not it was going to be a murder conviction or a manslaughter conviction. So what is a defendant supposed to do? Well, first of all, I would disagree that they were debating about whether it was supposed to be a murder or manslaughter conviction. Well, maybe that was too strong, but apparently that was on the table. Well, I think what happened was they were, the jury was instructed that it might be helpful to them to reach tentative conclusions as to all of the offenses, including the lesser offenses, before reaching a verdict. So the fact that they may have discussed manslaughter doesn't necessarily mean they were leaning towards it or that any jurors were going that way. They might have simply been following the instructions to reach tentative conclusions. Well, under California law, you give lesser included instructions if you believe that, right? So that's why they got them, and then there's an instruction that goes along with that. I'm sorry, what was the question? Well, under California law, you give lesser included offenses, even if they aren't charged, right? And then there's an instruction that tells the jurors how to approach that. Exactly, exactly. So the fact that they discussed it doesn't necessarily mean that they were seriously considering that. Well, maybe, let me think of it hypothetically. Let's just say that juror number two had said in the jury room, I know for a fact that this defendant was previously convicted of assault with a deadly weapon or attempted murder or something like that. If, I mean, Judge Pius was asking you, could there be some situations where prejudice could not be overcome? Might that hypothetically be a situation like that? I would absolutely agree. There are circumstances where there might be such prejudice from extrinsic evidence that it can't be overcome. And in your case, Judge Callahan, your hypothetical, that would be more prejudicial than in the instant case. So I think every case has to be looked at individually. And I think it's important to remember in this case that what came out was just her opinion about what might possibly have been the manslaughter, the sentence for manslaughter. And overall, it was a very, very small portion of lengthy deliberations. And most of the jurors, the jurors who were not dismissed, essentially said they thought it was just made in passing or it was a very short discussion, and they were able to put it behind them. They were frankly surprised that juror number six had become so distraught by it. And it appears that juror number six was very emotional during the deliberations. At one point, she said she cried. But the other jurors said that they were able to put it behind them. They themselves recognized the instruction not to consider it, and they moved on. So while there are definitely some cases where extrinsic evidence can be significantly prejudicial, I think overall, given the circumstances of this case, this is not a case where that presumption cannot be rebutted. Okay. Thank you, counsel. We'll hear from Mr. Fisher. We'll put two minutes on the clock, Mr. Fisher. Oh, I don't know if I can do it in two minutes. There is an enormous difference in the views of the parties given the reiteration by Mr. Tediff of the state's position, and I urge strongly a care in reading the best we could do in rebutting that in the appellant's reply brief. There is that error on pages 28 to 29 where it mentions juror number six. Should I file an errata, which I discovered only last night because it's juror number five, one of the jurors who stayed on the jury? I'm wrestling with that along with how to answer these things. The one thing that I agree with on Mr. Tediff's version of what was covered that's really clear is he disregards the statements of jurors that after that one of the jurors said she couldn't sleep at night if it was only two more years. Now, that kind of evidence, it was not explored by the judge. It was not explored by the lawyers' questions, apparently, but it's not up to the lawyers. It was not explored by the California Court of Appeal. And the presumption of prejudice that it was one of the jurors who remained on the jury is one the state has not rebutted, and it is extremely important here that this case, unlike almost all AEDPA cases, still requires that the presumption of prejudice be overridden by the state, and that includes in its application of the Brecht test at the end of the game. See, California can't show and hasn't shown because there isn't enough evidence in the record. There wasn't an evidentiary hearing in the district court. It cannot show beyond a reasonable doubt that the extrinsic evidence didn't affect the outcome. That's the test. I have not heard Mr. Tediff address that yet, and he has not answered the court's questions which raise that concern. If there is a problem, then I urge strongly that the court consider the Clark v. Chappell remand approach. It's the same approach that the court used in Tarango v. McDaniel, which is discussed in the real BFJ 29-30. Well, I'm sure you know when you're talking about Clark that I know about Clark. Yes, I noticed that. All right. Okay. Well, okay. So that's Clark. I think this case maybe has to go that route because Judge Liu, a wonderful trial judge, holding an evidentiary hearing could deal with these problems and come to the answer of things that I haven't heard decided on either side here. We just don't know. All right. Thank you. Thank you, Mr. Fisher and Mr. Tediff. Yes, thank you. Thank you. Thank you. Appreciate your arguments and your willingness to participate in our virtual court matter as submitted. All the other cases on today's calendar are submitted, and that ends our session for today and for the week. This court for this session stands adjourned. Thank you.
judges: Paez, Callahan, Lynn